K. IMADA, *et al. vs.* THE STEAMSHIP "STANLEY DOLLAR."

August 29, 1905.

*Charter-Party or Contract of Affreightment.—Mutuality of Interest:* The owners of a vessel entered into a contract or charter with another company to proceed to a certain port and receive such passengers as should be furnished by the latter company, and transport them to another port at so much per head without any guarantee by the charterers as to the number of passengers to be furnished or stipulation for demurrage or for damages for delay in the delivery of such passengers. *Held,* that this was a mutual enterprise, the owners being interested in the work of procuring a sufficient number of passengers to fill the vessel.

*Agency.—Circumstances Tending to Show:* A person soliciting passengers for such enterprise and furnishing information as to the passenger fare and collecting money and notes for such fare and issuing receipts therefor in the nature of passenger tickets, and assuming to act with authority in providing such vessel for the purpose, may be regarded as holding himself out to be the agent of such vessel and consequently of those controlling it.

*Same.—For Several Parties in Matters in which they have a Mutual Interest:* A person acting as agent for the owners of such vessel and also acting ostensibly as the agent of the charterers in carrying out the work of the one soliciting passengers, by inspecting them for the purpose of

accepting or rejecting them as well or fit for the voyage, is in the view of the mutual character of the enterprise, acting for the owners as well as for the charterers.

*Same.—Ratification:* The action of such agent in inspecting the passengers procured by the soliciting agent, and receiving from him a part of the passage money on account of each passenger for the ship owner, and issuing tickets therefor to such passengers, though unknown to them, for a different voyage than the one they had contracted for with the soliciting agent, was a ratification of such previous contract, if he was fully informed of the nature thereof and the material facts relating thereto, a ratification of an agency in part being a ratification of it as a whole.

*Passenger Contract.—Mistake.—Foreign Language.—Right of Withdrawal:* Intending passengers receiving tickets in a language they do not understand, which are not explained or interpreted to them, and having good reason to suppose that they are for a different voyage from the one named in such tickets, are not bound by them, but upon learning of their real character, may, before the vessel sails, repudiate them and abandon the voyage.

*Same.—Dissolution of, by Change of Destination of Voyage:* Intending passengers who have purchased tickets for a certain destination, not bound if the destination of the voyage is changed without their consent.

*Same.—Admiralty Jurisdiction:* When purchasers of passenger tickets go aboard the vessel designated, with their belongings, for the purpose and with the expectation of departure with such vessel, the jurisdiction of the Admiralty attaches.

In Admiralty: Libel *in Rem* for Damages for Breach of Contract.

Geo. A. Davis, Proctor for Libellants.

E. C. Peters and John W. Cathcart, Proctors for Libellee.

DOLE, J. This is a libel *in rem* by thirty-six Japanese, who allege that their several causes of action are based upon similar facts and that their claims are similar, and pray that they may be permitted to join as libellants in one action, which request was allowed. The grounds of the libel are that the master and owners of the steamship "Stanley Dollar", engaged a person known as Kikutake to solicit and obtain passengers for a voyage from Honolulu to Seattle or Tacoma, in the State of Washington; that the representations made to the libellants by the said

agent of the said steamship company and the master, were by advertisement published in the Japanese language in a public newspaper of the Territory and verbally by the said agent, and were to the effect that such ship would sail on or about the 19th day of June, and that it was properly equipped, and authorized for carrying passengers; that thereupon they applied to him for passage and paid the fare therefor, amounting to $32 apiece; and that they made their preparations to leave on or about the 19th day of June, giving up their occupation on a sugar plantation on the Island of Oahu, procuring clothes and other supplies; but that said ship was not authorized to carry passengers at that time, having no license therefor, and her departure was delayed for a long time so that they were compelled to abandon the voyage; that those in control of the said ship refused to make a voyage to Seattle but announced instead that she would make a voyage to Victoria; which the libellants alleged was a breach of their contract and subjected them to expense and inconvenience; that they have, since the 19th day of June, made demand upon the master and agent of the said vessel for a return of the passage money which was refused; that before the time set for the said steamship to depart, they went on board of the same and were received thereon as passengers; and that in consequence of such breach of contract and such delay in sailing, they claim damages to the amount of five hundred dollars each.

The master of the ship, Mr. Bruce, filed a claim on his own behalf and that of the Stanley Steamship Company, Ltd., a corporation, which corporation he claimed to be owner of such steamship. The answer of Captain Bruce alleges that the vessel is owned by the Stanley Dollar Steamship Company, a foreign corporation, and denies the allegations of the libel in regard to the engagement of Kikutake to solicit passengers, and denies, or professes ignorance of, substantially everything else contained in the libel, and alleges that the steamship "Stanley Dollar" was, before the 19th day of June, employed by the Commercial Dock Company, a corporation with its principal place of busi-

ness at Tacoma, to proceed to Honolulu and there to receive Japanese passengers selected and offered by such company and transport the same to Victoria in British Columbia; that the libellants having been regularly offered by the Commercial Dock Company to said steamship at Honolulu, they received tickets entitling them, subject to the conditions of such tickets, to passage on such vessel from Honolulu to Victoria; that the libellants upon the receipt of such tickets accepted the terms and conditions thereof and agreed to be bound thereby; and that on the 15th day of July, the time of the departure of the said vessel, she was ready and able to accept libellants on board, subject to the conditions of the said tickets, and transport them to Victoria.

The following facts may be regarded as established beyond question:

A person by the name of Kikutake advertised in two Japanese papers published in Honolulu, on the 9th and 10th of June, 1905, for laborers to go to Seattle and Tacoma, promising a special steamship, the "Stanley Dollar," for their conveyance, to sail on the 19th of that month direct to Seattle, and giving particulars as to wages and passenger fares on such vessel. The following is a translation of one of such advertisements published in the Hawaii Shinpo on the 10th of June:

"Wanted.  600 laborers to go to Seattle and Tacoma.  Rail-"road laborers, wages per day $1.25 to $1.35; laborers to board "themselves.  Salmon canning factories, wages per day $1 to "$1.25, and boarded by the factory.  To recruit these laborers "I have applied and received a license from the Territorial "Government and will bring a special steamer, the Stanley Dol-"lar, over without delay and send her to Seattle, America, "direct.  The passage fare for each passenger is $32, if, how-"ever, an intending passenger is not able to pay the said amount, "I will lend $20 to such person.  All those who wish to come, "notify me on or before June 14th.  Office of Kikutake, on "Pauahi Street, near River, Honolulu."

The libellants paid $12 each on account of their passage and gave their notes for $20 for the balance, receiving receipts for such cash payments from Kikutake, which receipts are marked with a round stamp containing a design of a vessel under full sail, the words "passenger ticket" above, the capital letters "H. S." below and the date "June 19 (or 20) 1905" across the middle.

In connection with this enterprise, a person by the name of Stanley Dollar came to Honolulu ostensibly as agent of the Stanley Dollar Steamship Company, a corporation, and issued tickets to the libellants between the 19th and 26th of June, for passage to Victoria, B. C., on the steamship "Stanley Dollar," receiving therefor from Kikutake $14 for each ticket.

On the 28th of June, the libellant, K. Imada, went aboard the "Stanley Dollar," lying at anchor in the harbor of Honolulu, with his baggage; the next day he came ashore, where some one,—a white man,—inspected his ticket and told him it was for Victoria, whereupon he made up his mind not to go on the vessel and then went aboard to bring his baggage ashore but was prevented from so doing by some one on the ship. He thereupon came ashore and began proceedings against the ship.

The libel asks for damages on two grounds, first, that the "Stanley Dollar" did not sail at the time agreed on nor for a long time afterwards, whereby the libellants were compelled to abandon the voyage. Second, that by reason of the breach of contract on the part of the vessel to carry them to Seattle, they suffered damages for loss of time and expense of their preparations for the voyage.

As it does not appear by the evidence that Imada gave up the voyage because of the delay of the departure of the vessel, I will leave any further consideration of the said first ground of the libel out of the case, as being unsupported by the evidence, and this makes it unnecessary to consider the questions arising from the fact that at the time the passenger tickets were issued,

the ship "Stanley Dollar" was without a license to carry passengers.

In regard to the second ground of the libel, the question is one of agency. If Kikutake was an agent of the vessel when he advertised for passengers and gave the receipts for passage money, or if his action was ratified by those in control of the ship, then there is a breach of contract and the ship is liable.

"If the ship, her master and owners, do not faithfully and fully perform their contracts to carry goods or passengers, the ship is liable *in rem,* and the master and owners *in personam,* in admiralty, for the damages." *Benedict's Admiralty,* Sec. 286.

The witness, Stanley Dollar, was introduced by the counsel for the libellants and, perhaps naturally, as representing the claimants, was an unwilling witness. From his own testimony he was the agent of the Stanley Dollar Steamship Company, a corporation, which appears from his evidence to be the agent of the Stanley Steamship Company, another corporation. The relations of the latter company to this case are not very clear. It further appears from the evidence of Mr. Dollar that the vessel "Stanley Dollar," owned by the Stanley Dollar Steamship Company, or by the Stanley Steamship Company, was engaged by the Commercial Dock Company of Tacoma under contract or charter to come to Honolulu and to take passengers to Victoria at a fixed rate of twenty-five dollars apiece. The testimony as to the conditions of this engagement is very slight. There is no evidence of any stipulation as to demurrage for delay in furnishing passengers or for damages for the ship's delay in sailing, nor any evidence of a stipulation on the part of the Commercial Dock Company guaranteeing any definite number of passengers. Apparently the contract did not give the management of the ship into the hands of the charterer nor did it let to it any specific part of the ship for the conveyance of passengers at a fixed rate for the room furnished. So far as can be gathered from the evidence, it was a venture in which both parties to

the contract took the risk of a failure of procuring a sufficient number of passengers to fill the vessel, so that it was, in a sense, a mutual venture but not reaching such degree of mutuality and sharing of profits or losses as would create a partnership. The Stanley Dollar Steamship Company furnished the ship, equipped and provided with a master and crew and fuel and was to receive twenty-five dollars a head for such passengers as she should carry to Victoria. The Commercial Dock Company used its influence to furnish the passengers, receiving for its profits in the venture, such balance of the fare as should be received over and above such twenty-five dollars.

Although Kikutake, the agent of some Oregon people from Tacoma, as testified by Stanley Dollar, showed a similar reticence in regard to furnishing information as that exhibited by Mr. Dollar, promptly stating in answer to questions that he did not represent the claimants and that he did not represent anybody but himself, yet his published notices in which he advertised the steamship "Stanley Dollar" for the conveyance of the expected passengers, together with the fact of his bringing the libellants to Mr. Dollar, the agent of the steamship "Stanley Dollar," and paying him $14 on account of each libellant, with the evidence of Stanley Dollar that he, Dollar, was authorized by the Commercial Dock Company to inspect intending passengers and reject any that were sick or that he considered unfit for the voyage, are strong indications that he, Kikutake was all the time acting for the steamship "Stanley Dollar" and its owners and the Commercial Dock Company, as well as for "some Oregon people," and that he had held himself out as such an agent; although, as far as the question of ratification goes, it is not necessary that he should have held himself out as an agent for another. *1 Clark & Skyles on Agency,* 264, and cases cited. This reasoning is strengthened by the circumstance that each receipt which Kikutake delivered to the libellants contained the stamped impression described above, although the

meaning of the mark was not explained, yet it speaks for itself as characterizing the receipt as a passenger ticket for the advertised vessel.

On the occasion above referred to, when Kikutake and the libellants met Mr. Dollar and the money was passed over to him by Kikutake, he, Dollar, delivered to each of the libellants a ticket for steerage passage on the "Stanley Dollar" from Honolulu to Victoria, which each libellant was required to sign, but which was not attested by the agent, Mr. Dollar, nor any one, in the blank space on the same for that purpose, nor was it dated. The tickets were marked as issued by the Stanley Dollar Steamship Company. The libellants are plantation laborers and cannot read the English language, which was the language in which the tickets were printed.

Mr. Dollar testified that "I had the right to reject any man "that I did not want in case he was sick and not fit to make "the voyage. I was authorized to reject them." This last quoted testimony was in answer to the question by the claimants' counsel, "What arrangement, if any, Mr. Dollar, existed between "the Stanley Dollar Steamship Company and the Commercial "Dock Company, as to what passengers, if any, should be re-"ceived by the steamship at the port of Honolulu?" This evidence as to the agency of Mr. Dollar in inspecting and selecting the men, is significant in view of the mutual character of the enterprise in which not only was Kikutake engaged or acting in the collecting of these passengers, but his work was further carried out by Mr. Dollar in their inspection and selection or rejection, so that as far as the limited evidence throws any light on the question, he was acting both for the Commercial Dock Company and the claimants in the procuring and selection of the passengers, as the latter were to receive so much per head.

This is not a case of a contract of affreightment or charterparty, in which a certain part of the ship is let out to the charterers at so much for the voyage, nor is it a case of a general ship advertising for and receiving freight from any shipper, or

advertising for miscellaneous passengers. But the owner was perhaps more interested than the charterers in procuring enough passengers for the special voyage to fill the ship, and it shared the risk of failure to procure such number.

It is a settled rule that a ratification of the unauthorized acts of an agent or one assuming to act as an agent, to be binding, must have been made with full knowledge of all the material facts. In the case at bar there is no direct evidence that Mr. Dollar knew, at the time he accepted the results of Kikutake's work, that the latter had advertised that the "Stanley Dollar" would go direct to Seattle; but it is in evidence that after Dollar's arrival at Honolulu, and while staying at the Moana Hotel, Kikutake went there several times. Mr. Dollar was persistently pressed with questions by libellants' counsel as to what conversations took place on these occasions between him and Kikutake, but he as persistently attempted to evade replies to such questions. It however appeared from such replies as he made to the questions that conversations took place between them on the subject of Kikutake's work in regard to intending passengers. To the question "Did he say anything to you about "having arrangements to convey these passengers from Hono-"lulu to Seattle"? he answered, "No. I don't think so." To the next question "Will you swear there was not"? he replied, "No." The extreme reluctance of Mr. Dollar to furnish information on this point, together with his inability to swear that Kikutake did not say anything to him about "having arrangements to convey" the passengers from Honolulu to Seattle, the fact of Kikutake's several visits to his hotel and the likelihood that in discussing Kikutake's work, his public representations as to a voyage direct to Seattle were included, lead me to the conclusion that Mr. Dollar was cognizant of such representations made by Kikutake, when he accepted his work.

"We do not mean to say that a person can be wilfully ignorant, or purposely shut his eyes to means of information within his

own possession and control, and thereby escape the consequences of a ratification of unauthorized acts into which he has deliberately entered." *Combs v. Scott,* 94 Mass., 496, 497.

If this reasoning and conclusion of fact are correct, it follows that the work of Kikutake, as accepted and perfected by the agent of the claimants, was ratified by them, which ratification was a confirmation of the contract which these ignorant and helpless libellants made with Kikutake upon his representations that he would carry them direct to Seattle on a vessel which is ascertained to be the property and under the control of the claimants, and the failure of the claimants to carry them to Seattle was a breach of such contract for which the ship is liable.

"An adoption of the agency in part, adopts it in the whole, because a principal is not permitted to accept and confirm so much of a contract, made by one purporting to be his agent, as he shall think beneficial to himself, and reject the remainder." *1 Parsons on Contracts,* 50.

"When a card has been published, advertising a ship for a specific voyage, if that be altered, I am of opinion that the owner is bound to give specific notice of the alteration, to all persons who afterwards ship goods on board the vessel; and that he is otherwise answerable for the loss which they sustain by supposing that the destination of the vessel remains unaltered." *Peel v. Price,* 4 Campbell, 242, 243.

The libellants, not being able to read the tickets, and supposing that they had purchased tickets direct to Seattle, according to their previous engagement, were fully justified, upon learning of the real destination of the ship, in withdrawing from the engagement, and their having received the tickets and gone on board of the ship with the expectation of sailing, brings the case within the admiralty jurisdiction.

It is contended by counsel for the claimants that as the evidence shows that the libellants did not read the advertisements published by Kikutake, and did not personally hear from him

his proposition about the voyage, the ship is not liable even if it should be decided that Kikutake's action was ratified by claimants. It appears to me, however, that if the information given out by Kikutake through the advertisements and his conversations with different people correctly reached the libellants through any channel, and in consequence thereof they engaged passage as they supposed to Seattle, such result binds Kikutake's principal.

The contention of counsel for the claimants, that the libellants are bound by the tickets in the English language issued to them by Mr. Dollar does not appeal to me. There is no evidence that these tickets were read or explained to them at the time. There is evidence showing that they received them in good faith as tickets direct to Seattle. As soon as they became aware of their real character, they repudiated them and abandoned the voyage as they had a right to do.

A number of objections were made by both sides, to the introduction of evidence. Ruling was reserved on some of these. Much of this matter is disposed of by the finding that the claim for damages based upon the alleged delay in sailing is unsupported. The finding on the other ground renders it unnecessary to further consider such objections as relate to evidence used in reaching such conclusion.

Only one of the libellants, K. Imada, testified, and it was agreed between counsel that his testimony should be taken as applying to all of the libellants. He testified that the value of his baggage was about $30, and described certain items from which it would appear that his appraisement of $30 was not unreasonable. Also that his wages on the plantation at Waipahu, where he was working at the time he came to Honolulu to engage passage, were $24 a month, boarding himself; that he left the plantation on this enterprise on the 17th of June, between which time and the 29th of June, when he came ashore, giving up the voyage, was twelve days. From that time to the present he has not been working, on account of this law suit, making

forty-one more days.  He owed for his board fifty cents a day. I consider it equitable to include as damages loss of work and the board from the time the libellants left the plantation, June 17th, to the 29th of June, when the voyage was abandoned, and from then to the close of the trial on August 9th, fifty-three days in all; as these men being interested in the case and expecting to give testimony therein were at a disadvantage in trying to procure work and it was on account of this departure on the part of the ship from the agreement entered into and affirmed by its agents that these libellants have been put to this great inconvenience and expense.  There is no evidence as to other damages from the loss of the expected trip to Seattle and therefore no damages can be allowed on that ground.

Independently of the questions of agency and ratification, I think the libellants are entitled to receive back the passage money and notes and the value of their baggage, from the fact that the tickets they received, printed in an unknown language to them, were for a different voyage from the one they had good reason to believe they were receiving tickets for, and that they repudiated the same and abandoned the voyage as soon as they ascertained the truth, which was before the ship sailed.

At the close of the libellants' case, the claimants by their counsel moved to dimiss, which motion was not then argued, and the case was continued upon the understanding that at the close of the testimony argument would be had on the whole case.  In view of the above findings, I allow damages to each of the libellants as follows:

For loss of baggage ....................... $30.00

Fare on Railroad to Honolulu ............. .45

Passenger fare,—cash and note............. 32.00

The matter of damages for loss of work for 53 days at $24 a month of 26 working days, and for expenses for 53 days board and lodging in Honolulu at $.50 a day, I refer to the Commissioner to adjust with power to take evidence thereon.

Decree will be made according to the above figures and the results arrived at by the Commissioner.

## FINDINGS OF THE COMMISSIONER.

The above case was referred to me by order of the Honorable District Court of the United States for the Territory of Hawaii, to adjust the matter of damages for loss of work for 53 days at $24 a month of 26 working days and for expenses for 53 days board and lodging in Honolulu at $.50 a day; for each of the libellants.

I was attended on September 2nd, 1905, by proctors for libellants and claimant and by witnesses. The testimony by me taken is hereto annexed and made a part hereof.

I find from page 2 of said testimony that the actual living expenses of said libellants while at work on the plantations is agreed between proctors for each side to be Ten Dollars a month, that during the period of 53 days from June 17, 1905, to August 9, 1905, there were 8 Sundays leaving 45 working days for which time each libellant is entitled to damages for loss of wages at $24 per month of 26 days equal to. . . . $41.54
that each libellant is entitled to expenses for 53 days for board and lodging at $.50 a day, equal to. . . . . . . . . . . .  26.50

making a total of . . . . . : . . . . . . . . . . . . . . . . . . . . . . . . . $68.04
that from this amount should be deducted the agreed actual living expenses of $10 per month for 53 days, equal to . . . . . . . . . . . . . . . . . . . . . . .-. . . . . . . . . . . . . . .  17.66

leaving a balance of . . . . . . . . . . . . . . . . . . . . . . . . . . . . $50.38
which I find is the amount due each libellant.

Respectfully submitted,

(Sgd.)   W. B. MALING,

U. S. Commissioner.

Honolulu, T. H., September 7, 1905.